1
2
3
4
5
6
7
8
9

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10
11

**NORTHWEST ENVIRONMENTAL ADVOCATES,** an Oregon non-profit corporation,

NO.

12

Plaintiff,

**COMPLAINT**

13

v.

Pursuant to Clean Water Act Section 505(a)(2), 33 U.S.C. § 1365(a)(2), and the Administrative Procedure Act, 5 U.S.C. § 702

14
15
16

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,**

17

Defendant.

18
19

## NATURE OF THE CASE

20

    1.      This is a civil action brought by plaintiff Northwest Environmental Advocates

21

("NWEA") challenging actions and inactions of the United States Environmental Protection

22

Agency ("EPA"). The claims concern water pollution clean-up plans known as Total Maximum

23

Daily Loads ("TMDLs") submitted or constructively submitted by the State of Washington to

24

EPA for review under the Federal Water Pollution Control Act, more commonly known as the

25

Clean Water Act ("CWA"). Specifically, the claims concern EPA's partial approval of

26

COMPLAINT - 1

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

Washington's submission of a multi-parameter set of TMDLs for the Deschutes River Basin (covering temperature, fecal coliform bacteria, dissolved oxygen, pH, and fine sediment), as well as Washington's constructive submission of no TMDLs for Budd Inlet and Capitol Lake, two of the most polluted waterbodies in the Puget Sound area.

2.      TMDLs are the means by which the Clean Water Act directs the restoration of waters that violate water quality standards. Restoration of these waters is of critical importance. Washington has determined that 91 percent of the Deschutes River currently exceeds temperatures that are lethal to salmon. Large parts of the Deschutes are critical habitat for Puget Sound steelhead, designated as threatened under the Endangered Species Act ("ESA"). Dissolved oxygen levels in Puget Sound, including embayments such as Budd Inlet, are predicted to continue to fall as nutrient pollution levels rise. Budd Inlet is critical habitat for ESA-listed threatened Puget Sound Chinook. Chinook salmon, in turn, are the primary source of food for the ESA-listed Southern Resident killer whales, the critical habitat for which includes most of Puget Sound, including Budd Inlet. Both Chinook and killer whales are threatened by chemical contamination.

3.      Pursuant to Section 505(a)(2) of the CWA, 33 U.S.C. § 1365(a)(2), the CWA's citizen suit provision, and 5 U.S.C. § 702, the right of review provision of the Administrative Procedure Act ("APA"), NWEA now brings this action challenging EPA's actions and inactions described herein.

## JURISDICTION AND VENUE

4.      This court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (federal defendant), 33 U.S.C. § 1365(a)(2) (CWA citizen suit provision), and 5

COMPLAINT - 2

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

U.S.C. §§ 701–706 (the APA). An actual, justiciable controversy exists between NWEA and defendant EPA. The requested relief is proper under 33 U.S.C. § 1365(a) and 5 U.S.C. § 706.

5. As required by CWA Section 505(b), 33 U.S.C. § 1365(b), NWEA gave notice of the citizen-suit claims asserted herein more than 60 days prior to the commencement of this lawsuit. Copies of NWEA's notice letters, dated May 23, 2019 and August 28, 2019, are attached to this Complaint as **Exhibits 1 & 2**, respectively. EPA has not remedied the violations alleged in NWEA's notice letters and is in continuing violation of the CWA.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e), 33 U.S.C. § 1365(a), and LCR 3(e) because a substantial part of the events or omissions giving rise to the claims occurred in Seattle, Washington, where EPA's Region 10 administrative office is located.

## PARTIES

7. The plaintiff in this action is NORTHWEST ENVIRONMENTAL ADVOCATES. Established in 1969, NWEA is a regional non-profit environmental organization incorporated under the laws of Oregon in 1981 and organized under Section 501(c)(3) of the Internal Revenue Code. NWEA's principal place of business is Portland, Oregon. NWEA's mission is to work through advocacy and education to protect and restore water and air quality, wetlands, and wildlife habitat in the Northwest, including Washington. NWEA employs advocacy with administrative agencies, community organizing, strategic partnerships, public record requests, information sharing, expert analysis, lobbying, education, and litigation to ensure better implementation of the laws that protect and restore the natural environment. NWEA has participated in the development of CWA programs in the State of Washington for many years, including the state's TMDL program by, *inter alia*, having brought suit in 1991 against EPA for

COMPLAINT - 3

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

its failure to establish TMDLs for the State of Washington and serving on EPA's TMDL federal advisory committee from 1996 to 1998.

8.      NWEA's members regularly use and enjoy the waters of the Deschutes River basin, Capitol Lake, Budd Inlet, and adjacent lands and have definite future plans to continue using them for recreational, scientific, aesthetic, spiritual, conservation, educational, employment, and other purposes. Many of these interests revolve around viewing sensitive salmonid species and other aquatic and aquatic-dependent species, such as birds and mammals, that are under threat by pollution in the waters at issue in this lawsuit. The use and enjoyment that NWEA's members derive from viewing these species, and otherwise recreating on or near and enjoying the waters of the Deschutes River basin, Capitol Lake, and Budd Inlet, is diminished by the effects of pollution, including pollution relating to temperature, human pathogens, dissolved oxygen, pH, nutrients, fine sediment, and toxics. NWEA's members would derive more benefits and enjoyment from their use of these waters if these pollutants were not adversely affecting water quality and aquatic and aquatic-dependent wildlife in these waters.

9.      Some of NWEA's members derive or used to derive recreational and aesthetic benefits by fishing in the Deschutes River. These members have curtailed their fishing in the Deschutes River, or no longer fish in the River, due in part to concerns regarding pollutants that have adverse effects on local fisheries, including high water temperatures, low dissolved oxygen, and high levels of fine sediment.

10.     Successful completion of TMDLs to address these pollution problems is a critical step in fully implementing the goals of the CWA for these waters, fully protecting salmonids and other aquatic and aquatic-dependent species, and improving water quality. EPA's failure to

COMPLAINT - 4

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

establish TMDLs for the waterbodies at issue in this lawsuit puts these species at risk and threatens or negatively affects the interests of NWEA's members.

11.     The recreational, aesthetic, conservation, employment, scientific, educational, spiritual, and other interests of NWEA and its members have been, are being, and unless relief is granted, will continue to be adversely affected and irreparably injured by EPA's failure to comply with the CWA. NWEA's injury-in-fact is fairly traceable to EPA's conduct and would be redressed by the requested relief.

12.     Defendant UNITED STATES ENVIRONMENTAL PROTECTION AGENCY is the federal agency charged with administration of the CWA, and specifically with establishing TMDLs for the waterbodies at issue in this case under Section 303(d)(2) of the CWA, 33 U.S.C. § 1313(d)(2).

## LEGAL BACKGROUND

### The Clean Water Act and Water Quality Standards

13.     Congress adopted amendments to the CWA in 1972 in an effort "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The primary goal of the CWA is to eliminate the discharge of pollutants into navigable waters entirely. The Act also established "an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife." *Id.* § 1251(a)(1–2).

14.     To meet these statutory goals, the CWA requires states to develop water quality standards that establish, and then protect, the desired conditions of each waterway within the state's regulatory jurisdiction. 33 U.S.C. § 1313(a). Water quality standards must be sufficient to "protect the public health or welfare, enhance the quality of water, and serve the purposes of [the

COMPLAINT - 5

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

CWA]." *Id.* § 1313(c)(2)(a). Water quality standards establish the water quality goals for a waterbody. 40 C.F.R. §§ 131.2, 131.10(d).

15.     Under Section 303(c) of the CWA, 33 U.S.C. § 1313(c), EPA is charged with approving or disapproving a state's water quality standards. *See* 33 U.S.C. §§ 1313 (c)(2)(a), (3). Once approved, they become the "applicable" water quality standards for purposes of the CWA. *See* 40 C.F.R. §§ 131.21(c), (d).

16.     Among other purposes, water quality standards serve as the regulatory basis for establishing water quality-based controls over point sources, as required by Sections 301 and 306 of the CWA, 33 U.S.C. §§ 1311 & 1316. A point source is a "discernable, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). Point source discharges are regulated under National Pollutant Discharge Elimination System ("NPDES") permits that require point sources to meet both technology-based effluent limitations and "any more stringent limitation . . . necessary to meet water quality standards." 33 U.S.C. § 1311(b)(1)(C). Water quality standards are thus integral to the regulation of point source pollution.

17.     Water quality standards also are used to establish measures to control nonpoint sources pollution. Unlike point source pollution, nonpoint source pollution is generally considered to be any pollution that cannot be traced to a single discrete conveyance. Examples include runoff from agricultural or forestry lands and increased solar radiation caused by the loss of riparian vegetation. Congress did not establish a federal permitting scheme for nonpoint sources of pollution. Instead, Congress assigned states the task of implementing water quality standards for nonpoint sources, with oversight, guidance, and funding from EPA. *See, e.g.*, 33 U.S.C. §§ 1288, 1313, 1329. Even so, water quality standards apply to all pollution sources, point

COMPLAINT - 6

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

and nonpoint alike. "[S]tates are required to set water quality standards for *all* waters within their

boundaries regardless of the sources of the pollution entering waters." *Pronsolino v. Nastri*, 291

F.3d 1123, 1127 (9th Cir. 2002) (emphasis in original).

### *Total Maximum Daily Loads*

18.     In addition to serving as the regulatory basis for NPDES permits and non-point

source controls, water quality standards are the benchmarks by which the quality of a waterbody

is measured. In particular, water bodies that do not meet applicable water quality standards, or

cannot meet applicable standards after the imposition of technology-based effluent limitations on

point sources, are deemed to be "water quality limited" or "impaired" and placed on a list of such

waters compiled under Section 303(d)(1)(a) of the CWA (known colloquially as the "303(d)

list"). *See* 33 U.S.C. § 1313(d)(1)(A); 40 C.F.R. § 130.2(j). States must then develop TMDLs for

all 303(d)-listed waters in order to establish the scientific basis for cleaning up water pollution

that violates water quality standards.

19.     A TMDL is the total daily loading of pollutants for a particular waterbody or

waterbody segment. *See* 40 C.F.R. §130.2(i). A TMDL "shall be established at a level necessary

to implement the applicable water quality standards with seasonal variation and a margin of

safety which takes into account any lack of knowledge concerning the relationship between

effluent limitations and water quality." 33 U.S.C. § 1313(d)(1)(C). The total amount of pollutants

that may enter a waterbody while still meeting water quality standards is called its "loading

capacity." 40 C.F.R. § 130.2(f). TMDLs for individual water bodies or segments are often

bundled together by basin, subbasin, or watershed in the same analytical document.

20.     TMDLs must be set at levels necessary to attain EPA-approved, *i.e.* "applicable,"

water quality standards. *Id. See also* 40 C.F.R. § 131.21(c), (d). Thus, EPA cannot approve a

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

TMDL based on standards that EPA has yet to review under Section 303(c) of the CWA, 33 U.S.C. § 1313(c). *Id. See also* 33 U.S.C. § 1313(d)(1)(C).

21.     Further, while a waterbody is deemed to be water quality-limited or impaired if it will violate "any water quality standard," 33 U.S.C. § 1313(d)(1)(A) (emphasis added), TMDLs for the waterbody must be set at a level necessary to attain all "applicable water quality standards," 33 U.S.C. § 1313(d)(1)(C) (emphasis added). As a consequence, once a state determines that a waterbody will not or cannot meet any single water quality standard after the imposition of technologically-based effluent limitations on point sources, the state must design each subsequent TMDL to meet all water quality standards that apply to the impaired waterbody and which are affected by the parameter or pollutant addressed by the TMDL.

22.     After calculating a waterbody's loading capacity, a TMDL then distributes portions of the total loading capacity to individual sources of pollution or sectors of pollution sources. These allocations include both "wasteload allocations" and "load allocations," for point and nonpoint sources of pollution respectively. 40 C.F.R. § 130.2(i). A wasteload allocation is "[t]he portion of a receiving water's loading capacity that is allocated to one of its existing or future point sources of pollution." *Id*. at § 130.20(h). A load allocation is "[t]he portion of a receiving water's loading capacity that is attributed either to one of its existing or future nonpoint sources of pollution or to natural background sources." *Id*. at § 130.20(f). In essence, the purpose of load and wasteload allocations is to allocate the total amount of pollution that may enter a waterbody between all the sources of pollution, including both point and nonpoint sources of pollution, thereby restricting pollution inputs sufficiently to attain and maintain water quality standards.

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

23.     As with water quality standards, states must submit TMDLs to EPA for approval or disapproval under Section 303(d) of the CWA. *See* 33 U.S.C. § 1313(d)(2). Section 303(d) requires that within 30 days after submission EPA either approve the TMDLs or disapprove them. *Id*. If EPA disapproves a state-submitted TMDL, it must then establish a replacement TMDL within 30 days. *Id*.

24.     Upon EPA approval or promulgation of a TMDL, all future NPDES permits must be consistent with the TMDL's wasteload allocations for point sources. 40 C.F.R. § 130.2(h); *id*. § 122.44(d)(1)(vii)(B). The approved load allocations serve as the basis for state and local programs for controlling nonpoint source pollution, including state programs that receive federal funds under Section 319 of the CWA, 33 U.S.C. § 1329. Once EPA approves a TMDL, the state must also incorporate the TMDL into its "continuing planning process" under Section 303(e) of the CWA. 33 U.S.C. § 1313(e)(3)(C).

25.     Although the CWA requires every state to establish TMDLs for all waterbodies on the 303(d) list—and to submit the proposed TMDLs to EPA for review under Section 303(d)(2), 33 U.S.C. § 1313(d)(2)—sometimes a state declines or refuses to do so. When a state's failure to establish TMDLs persists "over a long period of time," eventually it will "amount to the constructive submission by that state of no TMDLs.'" *Sierra Club v. McLerran*, No. 11-cv-1759-BJR, 2015 WL 1188522, \*5 (W.D. Wash. 2015) (quoting *Scott v. City of Hammond*, 741 F.2d 992, 996 (7th Cir. 1984)). This occurs when the state's prolonged failure clearly and unambiguously indicates that it has no intent to submit a required TMDL. *San Francisco BayKeeper v. Whitman*, 297 F.3d 877, 883 (9th Cir. 2002).

26.     Following a state's constructive submittal of no TMDL for a waterbody listed on that state's 303(d) list, the duty falls to EPA under Section 303(d)(2) of the CWA to establish a

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

TMDL for that waterbody. *Id. See also Columbia Riverkeeper, et al. v. Wheeler*, No. 18-35982, 2019 WL 6974376, at *6 (9th Cir. Dec. 20, 2019) ("Where a state has failed to develop and issue a particular TMDL for a prolonged period of time, and has failed to develop a schedule and credible plan for producing that TMDL, it has no longer simply failed to prioritize this obligation. Instead, there has been a constructive submission of no TMDL, which triggers the EPA's mandatory duty to act.").

### *The CWA Citizen Suit Provision*

27.     Section 505 of the CWA provides a private cause of action for citizens to enforce the procedural and substantive mandates and prohibitions of the CWA. *See* 33 U.S.C. § 1365. Among other things, this provision provides that "any citizen may commence a civil action on his own behalf . . . against the Administrator [of EPA] where there is alleged a failure of the Administrator to perform any act or duty under [the CWA] which is nondiscretionary with the administrator." 33 U.S.C. § 1365(a)(2). In such an action, "[t]he district courts shall have jurisdiction . . . to order the Administrator to perform such act or duty." 33 U.S.C. § 1365(a).

28.     Under Section 303(d)(2) of the CWA, EPA has a nondiscretionary duty to establish a replacement TMDL within 30 days after it disapproves a state-submitted TMDL. *See* 33 U.S.C. § 1313(d)(2) ("[EPA] shall not later than thirty days after the date of such disapproval . . . establish such loads for such waters as he determines necessary to implement the water quality standards applicable to such waters . . . ."). EPA similarly has a nondiscretionary duty to establish a TMDL following a state's constructive submission of no TMDL. *See, e.g., Sierra Club, supra,* 2015 WL 1188522 at *5.

COMPLAINT - 10

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

### *The Administrative Procedure Act*

29.     Section 702 of the Administrative Procedure Act, 5 U.S.C. §702, provides a

private cause of action to any person "suffering legal wrong because of agency action, or

adversely affected or aggrieved by agency action within the meaning of a relevant statute." Under

Section 706 of the APA, 5 U.S.C. § 706(2)(A), a court "shall . . . hold unlawful and set aside

agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law."

## FACTUAL BACKGROUND

### *The Deschutes TMDL*

30.     Washington's Deschutes River begins in the Bald Hills of the Gifford Pinchot

National Forest (west of Mt. Rainier), travels down through foothills and the cities of Tumwater

and Olympia, passes a dam that converted the former estuary into Capitol Lake, and ultimately

discharges to the marine waters of Budd Inlet and Puget Sound. The Deschutes River and other

tributaries to Budd Inlet and Capitol Lake are protected, *inter alia*, by Washington water quality

standards for temperature, bacteria as an indicator of human pathogens, dissolved oxygen, pH,

fine sediment, and nutrients. Some of these water quality standards are intended to protect human

use of the covered waters (*e.g.,* bacteria). Others are intended to protect sensitive aquatic life uses

such as rearing, migration, and spawning of salmon, steelhead, trout, and other aquatic life uses

(*e.g.,* temperature, pH, dissolved oxygen, fine sediment, and nutrients).

31.     Exceedances of some of these water quality standards can be harmful to human

health—for example, excess fecal coliform can indicate the presence of water-borne human

illnesses and pathogens (*e.g.,* hepatitis) associated with human waste and waste from other warm-

blooded animals. Exceedances of other water quality parameters can harm important fish and

COMPLAINT - 11

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

shellfish populations that depend on the Deschutes River watershed for survival. Such exceedances result in a failure to attain the CWA's goal of achieving water quality that provides for protection and propagation of fish, shellfish, and wildlife, and recreation in and on the water.

32.     For example, excess temperature can lead to depressed survival rates among salmonids due to adverse physiological and behavioral changes such as increased metabolic rates, reduced swimming performance, impairment of predator avoidance, and increased incidence of disease. Temperature often has a synergistic or additive effect by increasing the toxicity of other pollutants. Temperature also contributes to lower levels of dissolved oxygen in streams. Low dissolved oxygen, in turn, can have a number of deleterious effects on salmonids and other aquatic organisms, including decreased growth rates, decreased swimming ability, increased susceptibility to disease, and increased sensitivity to other environmental stressors and pollutants. Adverse changes to the pH of a waterbody can increase the harmful effects of water-borne toxics, particularly metals common in discharges of stormwater runoff. And too much fine sediment can lead to depressed fish stocks by, *inter alia*, smothering fish redds and lowering intergravel dissolved oxygen levels. For all of these reasons, achieving Washington's water quality standards for these parameters is a critical component of the CWA's goal of achieving water quality that allows for human recreation and provides for the protection and propagation of fish, shellfish, and wildlife. *See* 33 U.S.C. § 1251.

33.     Since at least the late 1980s, pollution in the Deschutes River basin, Capitol Lake, and Budd Inlet has attracted the attention of federal, state, and local governments. Many of the waters at issue in this lawsuit, including the Deschutes River, were added to Washington's 303(d) list of impaired waters as early as 1996 for impairments relating to excess temperature, fecal coliform, dissolved oxygen, and pH, total phosphorus, and on later lists for fine sediment.

COMPLAINT - 12

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

34. By 2002, Ecology had begun work on TMDLs to address these impairments, as well as related impairments in Capitol Lake and the marine waters of Budd Inlet. Over the next several years, Ecology published detailed studies on the sources and severity of the impairments and the sources of the pollutants, together with plans to remedy them through the TMDL process. These studies confirmed that the impairments are caused, in large part, by anthropogenic impacts throughout the basin. The causes of those impacts include: municipal discharges of treated wastewater; decreased riparian vegetation due to logging and development; deteriorating sewer infrastructure; improperly maintained, poorly located, or failing on-site septic systems; domestic animals; fertilizers and manure; stormwater runoff; and road building.

35. Thirteen years after it started, in September 2015, Ecology finally completed a draft TMDL to address these impairments in the Deschutes River basin, Capitol Lake, and Budd Inlet. *See* Ecology, *Deschutes River, Capitol Lake, and Budd Inlet Total Maximum Daily Load Study Supplemental Modeling Scenarios* (Sept. 2015). But rather than submit the TMDL to EPA for review under the CWA, by December of that year Ecology decided to split the Deschutes basin from Capitol Lake and Budd Inlet, claiming it would prepare a TMDL for the downstream portion of the watershed later.

36. In December of 2015, after removing Budd Inlet and Capitol Lake from the scope of the TMDL, Ecology finally submitted the Deschutes River basin TMDL to EPA for review under Section 303(d)(2) of the CWA, 33 U.S.C. § 1313(d)(2). *See* Washington Department of Ecology, *Deschutes River, Percival Creek, and Budd Inlet Tributaries Temperature, Fecal Coliform Bacteria, Dissolved Oxygen, pH, and Fine Sediment Total Maximum Daily Load: Water Quality Improvement Report and Implementation Plan – FINAL* (Dec. 2015, Pub. No. 15-10-012). We refer to this TMDL here as the "Deschutes TMDL Submission." It consists of multiple

COMPLAINT - 13

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

individual TMDLs for various waterbodies and waterbody segments within the Deschutes River basin.

37.     Over nearly the next two years, EPA failed to approve or disapprove the Deschutes TMDL Submission, in direct violation of Section 303(d)(2) of the CWA, which requires EPA to either approve or disapprove proposed TMDLs within 30 days of submission. *See* 33 U.S.C. § 1313(d)(2).

### *Prior Litigation Over the Deschutes TMDL*

38.     On November 6, 2017, NWEA filed suit against EPA in the Western District of Washington to force EPA to act on the Deschutes TMDL Submission. The lawsuit was captioned: *Northwest Environmental Advocates v. United States Environmental Protection Agency*, No. C17-1664RSL (W.D. Wash). We refer to it here as the "First Deschutes Lawsuit."

39.     On June 25, 2018, Judge Robert S. Lasnik granted NWEA's motion for summary judgment in the First Deschutes Lawsuit, and ordered EPA to either approve or disapprove the Deschutes TMDL Submission no later than June 29, 2018.

### *EPA's Partial Disapproval of the Deschutes TMDL Submission and Continuing Failure to Establish Replacement TMDLs*

40.     On June 29, 2018, EPA issued a letter disapproving 37 individual TMDLs within the Deschutes TMDL Submission for temperature, DO, pH, fine sediment, and bacteria. This group of disapproved TMDLs included all of Washington's proposed individual TMDLs within the Deschutes River basin for DO, pH, fine sediment, and bacteria. A copy of EPA's letter disapproving these individual TMDLs is attached to NWEA's August 28, 2019 notice letter in this action (included in Exhibit 1 hereto).

COMPLAINT - 14

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

41.     Specifically, EPA disapproved individual TMDLs for the waterbody and pollutant combinations listed below in Table A. For each waterbody, Table A also identifies the pollutant that is causing the impairment, and the identification numbers for each waterbody on Washington's 1996 and 2010 303(d) lists.

**Table A**

| Waterbody | Parameter | 1996 Listing ID | 2010 Listing ID |
|-----------|-----------|-----------------|-----------------|
| Huckleberry Creek | Temperature | WA-13-1024 | 3757 |
| Reichel Creek | Temperature | WA-13-1022 | 48666 |
| Tempo Lake Outlet | Temperature | --- | 48696 |
| Ayer (Elwanger) Creek | Temperature | WA-13-1015 | (73229) |
| Unnamed Spring to Deschutes River | Temperature | --- | 48923 |
| Adams Creek | pH | --- | 50965 |
| Ayer (Elwanger Creek) | pH | WA-13-1015 | 5850 |
| Black Lake Ditch | pH | --- | 50990 |
| Deschutes River | Fine Sediment | WA-13-1020 | 6232 |
| Ayer (Elwanger) Creek | Dissolved Oxygen | WA-13-1015 | 5851 |
| Deschutes River | Dissolved Oxygen | WA-13-1010; WA-13-1020 | 10894; 47753; 47754; 47756 |
| Lake Lawrence Creek | Dissolved Oxygen | --- | 47696 |
| Reichel Creek | Dissolved Oxygen | WA-13-1022 | 47714 |
| Black Lake Ditch | Dissolved Oxygen | --- | 47761; 47762 |
| Percival Creek | Dissolved Oxygen | WA-13-1012 | 48085; 48086 |

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

| Waterbody | Parameter | 1996 Listing ID | 2010 Listing ID |
|-----------|-----------|-----------------|-----------------|
| Adams Creek | Bacteria | -- | 45462; 45695 |
| Ellis Creek | Bacteria | WA-13-0020 | 45480 |
| Indian Creek | Bacteria | WA-13-1300 | 3578; 45213; 46410; (74218) |
| Mission Creek | Bacteria | WA-13-1380 | 45212; 46102 |
| Moxlie Creek | Bacteria | WA-13-1350 | 3759; 3761; 45252; 46432 |
| Schneider Creek | Bacteria | --- | 45559 |
| Reichel Creek | Bacteria | WA-13-1022 | 3763; 45566 |
| Spurgeon Creek | Bacteria | WA-13-1010 | 46061 |

42.     It has now been over a year and a half since EPA disapproved Washington's submittal of TMDLs for the waterbody pollutant combinations in Table A. EPA has yet to establish replacement TMDLs for these waterbodies as required by Section 303(a)(2) of the CWA, 33 U.S.C. § 1313(d)(2). In the meantime, water quality in the Deschutes River basin continues to be degraded, and the interest of NWEA's members continue to be harmed.

### EPA's Failure to Act on the Full Scope of the Deschutes TMDL Submission

43.     In addition to its failure to establish timely replacement TMDLs for the waterbody and pollutant combinations listed in Table A, EPA also failed to review the Deschutes TMDL Submission as it applies to many waterbodies throughout the basin. In several places, the Deschutes TMDL Submission states that the load and wasteload allocations established in that set of TMDLs will apply to various waters not currently included on Washington's 303(d) list. At a minimum, these waterbodies or waterbody segments include portions of Butler Creek, Ellis

COMPLAINT - 16

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

Creek, Indian Creek, Moxlie Creek, the Deschutes River, Hard Creek, Huckleberry Creek, Lake Lawrence Creek, Reichel Creek, Percival Creek, Thurston Creek, Johnson Creek, Mitchell Creek, and Spurgeon Creek. Indeed, the Deschutes TMDL Submission itself states that it applies to all waterbodies in the basin. Yet, EPA never reviewed the TMDL under Section 303(d) of the CWA as applied to these waterbodies.

44.     The collective waterbodies that EPA failed to review are discussed in NWEA's notice letter of August 28, 2019 (Exhibit 2 hereto), which is fully incorporated herein.

45.     By failing to review the Deschutes TMDL Submission as applied to all waters addressed in that set of TMDLs, EPA arbitrarily and capriciously narrowed the scope of its review under Section 303(d)(2) of the CWA, 33 U.S.C. § 1313(d)(2). EPA also failed to undertake a nondiscretionary duty within the meaning of the CWA's citizen suit provision, 33 U.S.C. § 1365(a)(2). As a result, there is no assurance that the TMDLs included in the Deschutes TMDL Submission are adequate to protect water quality in the Deschutes River basin.

***EPA's Approval of Individual Temperature TMDLs Within the Deschutes TMDL Submission***

46.     As for the portions of the Deschutes TMDL Submission that EPA did approve— consisting of 26 individual temperature TMDLs for specific waterbodies and waterbody segments within the basin—EPA's approval was arbitrary and capricious for a number of reasons.

47.     First, it is well known that excess temperature in the Deschutes River basin is at least partially responsible for adverse levels of dissolved oxygen and pH that are harmful to fish and other aquatic life. Indeed, the Deschutes TMDL itself acknowledges that "temperature [is] the biggest driver of [dissolved oxygen] saturation in the Deschutes River." Yet, in approving the load and wasteload allocations in the Deschutes TMDL Submission for temperature, EPA never considered whether those allocations will exacerbate already-harmful levels of dissolved oxygen

COMPLAINT - 17

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

and pH (including within the Deschutes River basin and in downstream waters), or whether the approved temperature loads will have harmful synergistic effects on fish and aquatic life when combined with other pollutants and impaired conditions. As a result, EPA has not demonstrated that the temperature allocations in the Deschutes TMDL Submission are sufficient to meet all applicable standards (including standards for dissolved oxygen and pH, and designated fish uses), as required by Section 303(d)(1)(C) of the CWA, 33 U.S.C. § 1313(d)(1)(C).

48.     Second, there is no reasonable assurance in the Deschutes TMDL Submission that the actual temperature targets established by the TMDLs will be achieved. For example, the models used to establish those targets were based on achieving 328 feet of forested riparian buffers for shade, but the submission itself only calls for 75- or 35-foot buffers, depending on the waterbody. The submission is vague with respect to where the various load allocations will apply, further reducing the likelihood that the temperature targets will be achieved. The load allocations established in the Deschutes TMDL Submission also fail to address, or inadequately address, channel restoration, microclimate, tributary and headwater temperatures, and flow—four factors that are critical for achieving applicable temperature standards in the Deschutes River basin. In addition, EPA based its finding of reasonable assurance on the TMDLs' informing stakeholders about how they can work together to address water quality problems, which does not provide any assurance that the problems will actually be dealt with. For these reasons, EPA's approval of the Deschutes TMDL fails to ensure that applicable water quality standards will be achieved.

49.     Similarly, third, the load allocations for temperature are based on only one surrogate—shade. This ignores other surrogate measures necessary to reduce in-stream temperatures to applicable limits—namely, channel morphology (*e.g.,* channel width:depth ratio),

COMPLAINT - 18

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

microclimate, headwater temperatures, and flow. EPA did not review the single surrogate load allocation to determine if it was sufficient to attain applicable water quality standards.

50.     Fourth, in order to achieve the temperature load allocations established by the Deschutes TMDL Submission, the submission lists a variety of Best Management Practices ("BMPs"), including the 35- and 75-foot riparian buffers as well as buffer widths established by state Forest Practice Act rules. The submission goes on to state that when landowners implement these BMPs, they will be deemed to be in compliance with the TMDLs. Thus, the BMPs themselves operate as the TMDLs' load allocations. However, the Deschutes TMDL Submission does not analyze whether these BMPs, as load allocations, are sufficient to meet applicable water quality standards. Nor did EPA review the BMPs, as load allocations, to determine if they are sufficient to attain applicable water quality standards.

51.     Fifth, in establishing temperature thresholds for waterbodies within the Deschutes River basin upon which the elements of the TMDLs are based (including loading capacity, load and wasteload allocations, and margins of safety), the TMDLs deviate from Washington's formally adopted, EPA-approved temperature criteria for fish and other aquatic life. Instead, the Deschutes TMDL Submission uses the state's so-called "natural conditions" provision at WAC 173-201A-260(1)(a) to change the applicable criteria without EPA's having first reviewed the new criteria to determine if they comply with Section 303(c) of the CWA, 33 U.S.C. § 1313(c), and the CWA's implementing regulations. *See, e.g.,* 40 C.F.R. § 131.11(a) (Criteria "must be based on sound scientific rational and must contain sufficient parameters or constituents to protect the designated use." Criteria must also "support the *most sensitive* use.") (emphasis added).  Thus, the Deschutes TMDL Submission was not calculated to attain "applicable standards" as required by Section 303(d)(1)(C) of the CWA, 33 U.S.C. § 1313(d)(1)(C).

COMPLAINT - 19

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

52.     Sixth, EPA did not review the new temperature criteria established pursuant to the state's natural conditions provision to determine if they will protect salmon, steelhead, and other aquatic life designated uses. This is despite the fact that at least some of the new criteria are within the lethal range for those species. In this way, too, EPA failed to determine whether the Deschutes TMDL Submission is calculated to attain all applicable standards.

53.     Seventh, the Deschutes TMDL Submission does not address Washington's antidegradation provision at WAC 173-201A-310(1), which constitutes one of the "applicable standards" with which the TMDLs must comply.

54.     Eighth, the Deschutes TMDL Submission does not establish adequate margins of safety. In major part, the purported margin of safety consists of various model assumptions used to derive the new criteria in the TMDLs, and which resulted in higher, less protective criteria than would have been allowed based on a more realistic set of assumptions. But setting hotter, less protective criteria is not a margin of safety. Further, while this approach may address how the new criteria were adopted, it does not shed light on whether they will actually be achieved. This approach ignores that the state may not establish new water quality criteria without formal EPA review and approval under Section 303(c) of the CWA, 33 U.S.C. § 1313(c), which did not occur here. In addition, while the TMDL submission itself says that the entire Human Use Allowance at WAC 173-201A-200(1)(c)(i) (allowing a 0.3°C increase above applicable criteria) should be reserved for the Deschutes River (*i.e.,* it should not be allocated to human sources of pollution), the TMDLs do not, in fact, do so.

55.     For the reasons above, EPA's partial approval of the temperature TMDLs within the Deschutes TMDL Submission was arbitrary, capricious, and not in accordance with the law within the meaning of Section 706 of the APA, 5 U.S.C. §706.

COMPLAINT - 20

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

*Washington's Constructive Submission of No TMDLs for Budd Inlet and Capitol Lake*

56.     For many decades, the marine waters of Budd Inlet, in the southern portion of Puget Sound, have been impaired by dangerously low levels of dissolved oxygen. For example, a fish kill in June 1981 of 40,000 Chinook salmon smolts was attributed to dissolved oxygen depletion. Likewise, Budd Inlet has also been impaired by various other pollutants, including toxics, for many decades. Those problems have never been remedied. Today, inner Budd Inlet has 95 individual segment-parameter listings on Washington's 303(d) list, while outer Budd Inlet has a total of 19 segment-parameter listings. The specifics of these 303(d) listings are discussed in NWEA's notice letter of May 23, 2019, which is attached as Exhibit 1 and fully incorporated herein.

57.     Similarly, Capitol Lake has been listed as impaired for total phosphorus since 1996 and bacteria indicating fecal contamination since 1998. Capitol Lake also suffers from large summer algae blooms driven at least in part by the excess phosphorus, which contribute to dissolved oxygen impairments in the lake itself and Budd Inlet immediately downstream. As with Budd Inlet, these problems have never been remedied and are unlikely to be remedied in the absence of TMDLs established under Section 303(d) of the CWA.

58.     Water quality impairments in Budd Inlet and Capitol Lake have not only existed and caused environmental harm for many years; they have also been studied intensively for many years.

59.     For example, in 1986, a study commissioned by Washington identified low dissolved oxygen in Budd Inlet as the cause of fish kills and water quality violations over a 15-year period, dating to approximately 1971. The purpose of this 32-year old study was to identify the cause of low dissolved oxygen and to identify what measures could be implemented to

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

resolve the problem. The study was based on studies from 1984 and 1985, and concluded that nutrient removal was required to substantially reduce algae blooms. EPA itself was sufficiently concerned about Budd Inlet water quality to issue its own study and "action plan" in 1991 that concluded toxic contamination in the inlet posed hazards to the aquatic ecosystem and established an objective of reducing or eliminating eutrophication, the process of nutrient pollution causing algal blooms that, in turn, remove dissolved oxygen from the water.

60.     Later, in 1992, Washington submitted to EPA proposed Budd Inlet TMDLs for total nitrogen, fecal coliform, and BOD-5. But EPA rejected those TMDLs in 1993, alleging they were "incomplete."

61.     More recently, in 2002, the Washington Department of Ecology once again began developing TMDLs for Budd Inlet and associated waterbodies including the Deschutes River and Capitol Lake. But despite having started 16 years ago, neither the Budd Inlet nor the Capitol Lake components of that TMDL were ever completed and submitted to EPA, although the technical studies for violations of water quality standards (for fecal coliform, total phosphorus, and dissolved oxygen) in these waters were published in 2012. Instead, Washington submitted only the freshwater component of the TMDL (absent Capitol Lake), resulting in the flawed, partial approval of the Deschutes TMDL discussed above.

62.     Since that time, Washington has continued to assert that it will complete TMDLs for Budd Inlet. But it has missed every self-imposed deadline for doing so, and its schedule continues to slip, demonstrating that Washington does not, in fact, have any firm plans for completing Budd Inlet TMDLs. Washington's analysis to date demonstrates that by far the largest human impact on dissolved oxygen levels in Budd Inlet is Capitol Lake.

COMPLAINT - 22

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

63.     As for Capitol Lake, Washington has not indicated that it has any plans to complete TMDLs for that waterbody anytime in the foreseeable future. The state has even indicated that it will even not consider whether to issue Capitol Lake TMDLs until it fully implements the current Deschutes TMDL (which EPA has already largely disapproved) and future Budd Inlet TMDLs (which have yet to be completed and submitted). That, in turn, could take decades more, if ever.

64.     Under the constructive submission doctrine, EPA must produce a TMDL under Section 303(d) of the CWA when the state has "'clearly and unambiguously'" abandoned its obligation to do so in the first instance. A period of state inaction in issuing a statutorily-required TMDL may ripen constructive submission of no TMDL, requiring EPA action. In order to avoid the constructive submission doctrine, the state must at least have a "credible plan" to submit the required TMDLs.

65.     Here, Washington has clearly and unambiguously abandoned its obligation to produce TMDLs for Capitol Lake, as evidenced, in part, by its position that despite completing the technical analysis it will not even consider submitting TMDLs for that waterbody until it has fully implemented the largely disapproved Deschutes TMDL and future Budd Inlet TMDLs, which could take a half century (or more) to complete. In turn, Washington's long delay and ever-slipping deadlines to produce Budd Inlet TMDLs have now ripened into a constructive submission of no TMDLs for that waterbody.

66.     Due to Washington's constructive submission of no TMDLs for Budd Inlet and Capitol Lake, EPA must now establish TMDLs for those waterbodies pursuant to Section 303(d)(2) of the CWA, 33 U.S.C. §1313(d)(2).

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

1

## CLAIMS FOR RELIEF

2

### FIRST CLAIM FOR RELIEF

3

### Failure to Establish Replacement TMDLs

4

### (Pursuant to 33 U.S.C. §1365(a)(2))

5

6
67.     NWEA realleges all preceding paragraphs.

7
68.     Section 303(d)(2) of the CWA requires EPA to establish replacement TMDLs

8
within 30 days of its disapproval of a state-submitted TMDL. *See* 33 U.S.C. § 1313(d)(2). EPA's

9
duty to establish replacement TMDLs within this timeframe is a nondiscretionary duty within the

10
meaning of Section 505 of the CWA, 33 U.S.C. § 1365(a)(2), the Act's citizen suit provision.

11
69.     Over a year and a half has elapsed since the EPA disapproved Washington's

12

13
submission of TMDLs for the waterbodies listed above in Table A. To date, EPA has not

14
established replacement TMDLs for those waterbodies.

15
70.     In failing to establish timely replacement TMDLs for the waterbodies in Table A,

16
EPA failed to perform a nondiscretionary duty within the meaning of the CWA citizen suit

17
provision, 33 U.S.C. § 1365(a)(2).

18
71.     EPA will remain in continuing violation of the CWA until it establishes the

19
replacement TMDLs.

20

### SECOND CLAIM FOR RELIEF

21

### Failure to Review the Full Scope of the Deschutes TMDL Submission

22

23
### (Pursuant to 5 U.S.C. § 702)

24
72.     NWEA realleges all preceding paragraphs.

25

26

COMPLAINT - 24

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

73.    Under Section 303(d)(2) of the CWA, 33 U.S.C. § 1313(d)(2), EPA has a duty to review all state-submitted TMDLs to determine if they will attain all applicable standards and otherwise meet the requirements of the CWA.

74.    In reviewing the Deschutes TMDL Submission, EPA failed to review those TMDLs as they apply to many waterbodies throughout the Deschutes River basin. At a minimum, these waterbodies or waterbody segments include portions of Butler Creek, Ellis Creek, Indian Creek, Moxlie Creek, the Deschutes River, Hard Creek, Huckleberry Creek, Lake Lawrence Creek, Reichel Creek, Percival Creek, Thurston Creek, Johnson Creek, Mitchell Creek, Spurgeon Creek. Indeed, the Deschutes TMDL Submission itself states that it applies to all waterbodies in the basin.

75.    EPA never reviewed the proposed TMDLs under Section 303(d) of the CWA as they apply to these waterbodies.

76.    By failing to review the Deschutes TMDL Submission as it applies to these waterbodies, EPA's action was arbitrary, capricious, and not in accordance with applicable law within the meaning of Section 706 of the APA, 5 U.S.C. § 706.

### THIRD (ALTERNATIVE) CLAIM FOR RELIEF

**Failure to Review the Full Scope of the Deschutes TMDL Submission**

**(Pursuant to 33 U.S.C. §1365(a)(2))**

77.    NWEA realleges all preceding paragraphs.

78.    By failing to review the Deschutes TMDL Submission as it applies to the waterbodies listed and discussed above in relation to NWEA's Second Claim for Relief, EPA failed to perform a nondiscretionary duty within the meaning of the CWA citizen suit provision, 33 U.S.C. § 1365(a)(2).

COMPLAINT - 25

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

79.     EPA will remain in continuing violation of the CWA until it reviews and takes formal action approving or disapproving the full scope of the Deschutes TMDL Submission.

**FOURTH CLAIM FOR RELIEF**

**Arbitrary and Capricious Partial Approval of the Deschutes TMDL Submission**

**(Pursuant to 5 U.S.C. § 702).**

80.     NWEA realleges all preceding paragraphs.

81.     As required by Section 303(d)(1)(C) of the CWA, every TMDL "shall be established at a level necessary to implement the applicable water quality standards with seasonal variation and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality." 33 U.S.C. § 1313(d)(1)(C). EPA may not lawfully approve a TMDL based on water quality standards that EPA has yet to review under Section 303(c) of the CWA, 33 U.S.C. § 1313(c). *Id. See also* 33 U.S.C. § 313(d)(1)(C). Finally, a TMDL must be calculated to attain all applicable standards that may be affected by the pollutant addressed in the TMDL.

82.     Here, EPA's partial approval of the temperature components of the Deschutes TMDL Submission was arbitrary, capricious, and not in accordance with the law. EPA's errors include the following:

83.     EPA did not evaluate whether the approved temperature allocations will exacerbate already-harmful levels of dissolved oxygen and pH, whether the approved temperature loads will have harmful synergistic effects on fish and aquatic life when combined with other pollutants and impaired conditions, or whether temperature allocations and loads will attain all applicable standards.

COMPLAINT - 26

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

84.     There is no reasonable assurance in the temperature TMDLs that the actual temperature targets established by those TMDLs will be achieved. The TMDLs are vague with respect to where the various load allocations will apply.

85.     The load allocations in the TMDL fail to address, or inadequately address, channel morphology, microclimate, tributary and headwater temperatures, and flow. Relatedly, the temperature allocations are based on only one surrogate—shade—when shade alone will not result in the attainment of water quality standards.

86.     The Deschutes TMDL Submission states that landowners will be deemed to be in compliance with the temperature TMDLs if they comply with certain BMPs. However, the submission does not analyze whether the BMPs are sufficient to meet applicable water quality standards. Nor did EPA review the submissions to determine whether the BMPs are sufficient.

87.     The temperature TMDLs deviate from Washington's formally adopted, EPA-approved temperature criteria for fish and other aquatic life. Thus, the TMDLs were not calculated to attain "applicable water quality standards" as required by Section 303(d)(1)(C) of the CWA, 33 U.S.C. § 1313(d)(1)(C).

88.     EPA did not review the new temperature criteria established in the TMDL submission to determine if they will protect salmon, steelhead, and other aquatic life designated uses.

89.     The Deschutes TMDL Submission does not address Washington's antidegradation provision at WAC 173-201A-310(1).

90.     The Deschutes TMDL Submission does not establish adequate margins of safety.

COMPLAINT - 27

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

91.     In all of these ways, EPA's partial approval of the temperature TMDLs within the Deschutes TMDL Submission was arbitrary, capricious, and not in accordance with the law within the meaning of Section 706 of the APA, 5 U.S.C. §706.

### FIFTH CLAIM FOR RELIEF

### Constructive Submission of No TMDLs for Budd Inlet

### (Pursuant to 33 U.S.C. §1365(a)(2))

92.     NWEA realleges all preceding paragraphs.

93.     Under the constructive submission doctrine, EPA must produce a TMDL under Section 303(d) of the CWA when the state has "'clearly and unambiguously'" abandoned its obligation to do so in the first instance. A period of state inaction in issuing a statutorily-required TMDL may ripen constructive submission of no TMDL, requiring EPA action. In order to avoid the constructive submission doctrine, the state must at least have a "credible plan" to submit the required TMDLs.

94.     Washington has long failed to submit any TMDLs for Budd Inlet, despite its having been on Washington's 303(d) list, and despite that the causes of the impairments have been studied intensively for decades.

95.     Washington has no credible plan for submitting TMDLs for Budd Inlet.

96.     Washington has clearly and unambiguously abandoned its obligation to submit TMDLs for Budd Inlet.

97.     For the reasons above, EPA has a duty under Section 303(d)(2) of the CWA, 33 U.S.C. § 1313(d)(2), to now prepare TMDLs for Budd Inlet for all listed parameters, and for all listed segments.

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

**SIXTH CLAIM FOR RELIEF**

**Constructive Submission of No TMDLs for Capitol Lake**

**(Pursuant to 33 U.S.C. §1365(a)(2))**

98.     NWEA realleges all preceding paragraphs.

99.     Under the constructive submission doctrine, EPA must produce a TMDL under Section 303(d) of the CWA when the state has "'clearly and unambiguously'" abandoned its obligation to do so in the first instance. A period of state inaction in issuing a statutorily-required TMDL may ripen constructive submission of no TMDL, requiring EPA action. In order to avoid the constructive submission doctrine, the state must at least have a "credible plan" to submit the required TMDLs.

100.     Washington has long failed to submit any TMDLs for Capitol Lake, despite that waterbody's having been on Washington's 303(d) list, and despite that the causes of the impairments have been studied intensively for years.

101.     Washington has no credible plan for submitting TMDLs to address impairments in Capitol Lake and its downstream impacts to Budd Inlet.

102.     Washington has clearly and unambiguously abandoned its obligation to submit TMDLs for Capitol Lake.

103.     For the reasons above, EPA has a duty under Section 303(d)(2) of the CWA, 33 U.S.C. § 1313(d)(2), to now prepare TMDLs for Capitol Lake for all listed parameters, and for all listed segments.

/ / /

/ / /

/ / /

COMPLAINT - 29

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

1

**PRAYER FOR RELIEF**

2

WHEREFORE, plaintiff Northwest Environmental Advocates respectfully requests that

3

this Court:

4

A.      Declare that EPA has violated its nondiscretionary duty under 33 U.S.C.

5

6

§1313(d)(2) to timely establish replacement TMDLs for the waterbodies listed above in Table A;

7

B.      Enter an order directing EPA to establish replacement TMDLs for the waterbodies

8

listed above in Table A, as required by Section 303(d)(2) of the CWA, 33 U.S.C. § 1313(d)(2);

9

C.      Declare that EPA acted arbitrarily and capriciously and/or failed to carry out a

10

nondiscretionary duty under the CWA by failing to review the full scope of the Deschutes TMDL

11

Submission;

12

D.      Declare that EPA acted arbitrarily and capriciously in its partial approval of the

13

temperature components of the Deschutes TMDL Submission;

14

E.      Vacate and set aside EPA's partial approval of the temperature components of the

15

Deschutes TMDL Submission;

16

F.      Declare that Washington has constructively submitted no TMDLs for Budd Inlet;

17

18

G.      Declare that Washington has constructively submitted no TMDLs for Capitol Lake

19

H.      Order EPA to establish TMDLs for all listed parameters and all listed segments

20

within Budd Inlet;

21

I.      Order EPA to establish TMDLs for all listed parameters and all listed segments

22

within Capitol Lake;

23

J.      Award NWEA its reasonable costs and attorneys' fees under 33 U.S.C. §1365(d)

24

and 28 U.S.C. § 2412; and

25

K.      Grant such other relief as the Court deems just and proper.

26

COMPLAINT - 30

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

1   DATED this 23rd day of December, 2019.

2           Respectfully submitted,

3           BRICKLIN & NEWMAN, LLP

4

5           By:  s/ Bryan Telegin

6           Bryan Telegin, WSBA No. 46686
            1424 Fourth Avenue, Suite 500

7           Seattle, WA 98101
            Telephone: (206) 264-8600

8           Fax: (206) 264-9300
            E-mail: telegin@bnd-law.com

9

10          *Counsel for Plaintiff Northwest Environmental*

11          *Advocates*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300